You are Alan M. Anseris from San Diego, New York. This is an asylum-based case that was denied by the immigration judge. The decision of the judge was upheld without comment by the Board of Immigration Appeals. The issues in this case are whether the respondent, the petitioner, had suffered past persecution or had a well-founded fear of persecution. The immigration judge found the petitioner to be reliable, that he was credible. That being the case, the only issues that I see here are whether what the petitioner suffered amounts to past persecution or has a well-founded fear of persecution, and whether there is a sufficient nexus or connection between the suffering that he experienced and one of the five protected grounds. Is this a mixed motive case? It might be considered mixed motive, but the firmest ground of this case, the firmest basis, is the fact that the petitioner was born in a Muslim country and then was granted refugee-type status, in Armenia. So he is ethnically Armenian, but because he was born in a Muslim state, that is, Azerbaijan, that he is looked upon and his family was looked upon as inferior, as traitors to his own people and was punished accordingly. The immigration judge incorrectly held that whatever happened to the petitioner was not enough to rise to the level of persecution. Well, I don't think that's what the Ninth Circuit has said in similar cases. So the facts here are not disputed, and the judge found the petitioner's story credible. So what happened? But why does this compel a different result? If there's two ways that you can look at it, why does this compel a different result? Don't you have to convince us of that? Well, certainly. But we have to look at first what happened to the petitioner, and there is no dispute about what happened to him. He suffered some kinds of discrimination during the years he lived in Armenia, for example. He was never permitted to work in that country, work for the government. He was trained as a dental technician, but he was precluded from working because he was born in a disfavored area. But the main incident happened when his son, who was also born outside of Armenia, was a refugee. And the law of Armenia says that he did not have to serve in the military, yet the military wanted to conscript him, that is, force him to serve in the military. The father accompanied the son to the military office, and when the father protested and showed the law that says, you cannot take my son, the father and the son were beaten, beaten severely. The son, and these are armed military personnel that are beating these two people. The son is taken away where he's held in custody in some unknown location in a jail for about ten days. The father is told, you must come up with a certain amount of money or you will not see your son, and things will be bad for you and your family. This is a threat by a military official. The father leaves, raises some money, not quite enough to satisfy the military officer, and then the military goes to the father's home where he threatens, where the military threatens the mother, the wife of the petitioner, and the children of the petitioner, two young ladies. Threats are made that if you do not comply with what we are ordering, bad things will happen to the women, bad things, rape, incarceration, beating, torture. The father took the son, after payment of money, the father took the son to Russia, and then further threats were made against the family. The father had to return to Armenia, where he faced the military again, and he was coerced to pay even more money. So why isn't this just an extortion case? Well, you have more than extortion here. You have harassment, you have physical beating, you have threats of incarceration. Which means, why is this not just a criminal case, why is this ethnic persecution, and how do we know they don't extort everybody? The materials that were submitted at the time of the case before the immigration judge showed that there is a pattern in Armenia, of Armenian officials against ethnic Armenians who are relocated from Muslim states. So it is not just this family, and it is not just, it's not just anyone, it is this specific group, and it is not just this family. Armenian ethnic, Armenian Christians who are born in a Muslim state, who relocate to Armenia, are not trusted, they are treated as a foreign element in the country. I would look to a Ninth Circuit case that is cited at page 21 of our brief, Guo versus Ashcroft. This is a 2004 case, and also Korablina, where these almost the same elements of the case appear and are cited in the materials. That is, finding persecution where a petitioner witnesses violent acts, suffered extortion, harassment, and threats by ultra-nationalists, and this is a 2004 case. And that is exactly what we have here, exactly what we have. The immigration judge did not seem to think that the physical beating, which was one expanded incident, was enough to rise to the level of persecution. But the Ninth Circuit does not require more serious bodily injury. Did he rule that it wasn't sufficiently serious, or that there wasn't proof of a nexus to a protected ground? He said there was not sufficient nexus, but the nexus is particular social group. But that means not that the beating wasn't sufficiently a serious beating, what he's saying is that he didn't show it because of his ethnicity, it was a criminal act, not political persecution. Well, I don't see the criminal act here. By the military trying to work outside the law, well, that's not an excuse for what would otherwise serve as persecution. And there is a sufficient nexus here. This family had been persecuted, and the military went after them because of the ethnicity, and because the military thought they could take advantage of the situation because of the weakness of the petitioners. You've got about a minute left for rebuttal. Good morning. Good morning, Your Honors. Margaret O'Donnell for the United States. I have a question. If this is a mixed motive case, how would you distinguish the four from the facts in this case? First, I would argue that it's not a mixed motive case. Give me your argument on that, and then just assume for a moment that it is, and then talk about it. My argument on that goes to the petitioner's testimony, which counsel correctly stated was found to be credible. It was not only credible, it was consistent with both the country reports and the Department of State profile of asylum claims. And what he states throughout, what the petitioner states throughout, is that this would have happened to anyone, an Armenian citizen, an American citizen, an American citizen. It would have happened to a citizen or a refugee, because what happens in Armenia is that there is such corruption that people buy their way out of their national service. And so Major Gougezian, the bad guy in this case, is forced to meet his numbers, and he does that any way he can. And in this case, he went for the refugee, the son of the petitioner. I would note the petitioner, at the time this happens, is a citizen of Armenia, as is his wife. They have moved on. The children are still refugees. It is not a mixed motive case, because he calls him an upside downer, which is the opposite of being a traitor. But petitioner, in both his affidavit to his asylum application and in his testimony, he describes what happens when he goes in and presents this card, saying, see, my son is exempt from national service. He's a refugee. The major says, I spit on your rights, you know, your rights are rats or whatever he says. It's a little confusion, but petitioner states that the atmosphere increases. Neither side backs down. They keep going at each other. It gets more intense and more intense and more intense. The record is not clear as to who threw the first whatever, but it becomes a physical encounter. A fight begins. The petitioner's father is knocked to the ground. The son comes to his father's defense, pushes back the major. The major rears back and says, who are you putting your hands on, calls in the guard and brings them in. At that point, he calls the son an upside downer, a traitor. My argument, and I think the board also felt this way, or the immigration judge, is that this was in the heat of a physical confrontation. It is not sufficient to color the entire event as an attack against a petitioner. The upside downer also, he testified, has an ethnic connotation to it. Doesn't that give us a glimpse into what their motivation was? I think that gives you a glimpse into what the dynamics of the community is. But I don't think that one epithet in the course of this encounter, which was two people against one, and then military help coming in, batons being used, a father being knocked out, and a son disappearing. I don't think that that is sufficient. In the context that the record shows that most native Armenians would also be subject to unlawful recruitment and extortion by the military. So as the background for that, to then make these comments sounds pretty close to racial slurs. Strong evidence that it was because of race or ethnicity. I would argue that, Your Honor, I would say that that's strong evidence of the social fabric in Armenia. But it's not a single epithet thrown in the heat of a physical encounter. I would argue it's not sufficient to overcome petitioner's own testimony that what he was encountering would have been encountered by Armenian citizens, as well as refugees. And that this was the result of a corrupt system whereby people bought their way out of service, and thus the military, which is the region that petitioner comes from, is still a viable, a volatile area. And so the military needs their conscripts. So if I understand your argument, what you're saying is that this happens to everyone there, and it's a corrupt place, and so that the IJ and the BIA basically find this isn't, it's not persecution, it's persecution. It's not mixed motive, it just happens to everyone, it's a bad thing, but it's not on account of. And then our standard of review is it has to compel finding otherwise, and you're saying that it doesn't? Is that? I would agree with your summary with this one caveat. Okay. My argument is premised on what petitioner stated in his testimony, and which he stated repeatedly in his testimony, that this was not how he was asked specifically. Was this happening to you because you were a refugee? No. Would this have happened to an Armenian citizen if they had gone and defended their son being conscripted? Yes. And that's in the record at page 185. It's also addressed at page 164 through 166 in his testimony. It's his testimony which was found to be credible and consistent with the Department of State reports, which says there is no nexus to ethnicity here. And I would note that prior to this event in 2000, he had been living with his family in Armenia for 11 years without any event. During that time period, although he was not able to work as a dental technician, he did start a wholesale business, which apparently was successful enough that he went to the United States on two occasions, 1996 and 1998. It was only in 2000 that he applied for asylum, and after that application was entered, he was heard by an asylum officer, an immigration judge and the board, and the conclusion was he had not established a nexus. And he did not establish a nexus because he freely admits throughout that this would have happened to anyone. But essentially it is a one-time event that takes place over a period of time. Also, there was no, although he did not pay the extortionate amount, the 4,000, he went back to the major and gave him 2,000. And the major said, no, you have two more days, bring me the whole amount. The payment was to prevent criminal charges being brought against him. No criminal charges were lodged when he did not pay the money on time. He then took that $2,000 and instead paid a $1,500 bribe to get his son out of prison for 10 hours, during which time he took him to Russia. He comes back because the military has gone to his home, the soldiers are there with his family members, and they say, you come back or something bad is going to happen. He comes back still, no criminal charges are entered against him. There's no evidence that it was anything more than a threat to bring these criminal charges against him. In the aftermath, no charges are brought against his family members, nothing happens to his wife and daughters. They go to the embassy, they obtain visas, he sneaks his passport out of the embassy, obtains a visa, and they leave for Russia and from there come to the United States. But there was no evidence, although there was time, there was no evidence that the major or anyone else was going to fulfill those threats against them. And I would state that that falls right into the Hawkshaw case that this Court decided, where unfulfilled threats don't amount to persecution. And it's his own testimony on which this is based. But I see I'm rapidly running out of time. Are there any other questions? Judge Callahan, judgment? If we got to a mixed motive argument, do you think Gafoor is any problem for you? I don't for the reasons that I said, that it's this one incident, it's in the heat of battle now. If he had, when they entered the room, before they said anything or when they had just shown their documents, saying, look, my son's a refugee, he's exempt from national service. If the major had said something along the lines of, oh, you upside-downers or whatever, and started out at that, putting them on their back feet, putting them on the defensive, then I would say, yeah, maybe Gafoor comes in a little stronger here. But it was after they started, and I don't know from the record who was hit where, you know, what it was that prompted the major to let that slur go when he had not done so earlier. Okay, I don't have any further questions. Thank you, Ms. O'Donnell. Let me ask you a question. Ms. O'Donnell makes a pretty powerful argument that your client testified that this is the way everybody's treated. Well, everyone for this particular petitioner were the people that he came from. The people that he knew that these things happened to were people like him. There was a large influx of Azerbaijani Christians, Armenian Christians, who came to Armenia at about the same time that this petitioner came. So you're saying that the record will show, when we look it up again, that when he testifies that this happens to everybody who's drafted and tries to get out of it, he's talking about only people of ethnic Armenian? I can't say that the record speaks to that point. But in that petitioner's mind, I believe that's what he meant in his circle that he knew. Now, I think that the record will show that there is a sufficient nexus, because everything else is there, everything else is there. The racial slurs, the attack on the ethnicity, the denigration of the people as a foreign element that cannot be trusted, the beating, the incarceration, the threat of harming not only the son, the father, the mother, and the children. And I see you're tying this up. Thank you very much. The next case is 0855223, Vinole v. Country Light Home Loans. Each side has 15 minutes on this case. Thank you.
judges: Silverman, Callahan, Mills